## In the District Court of Allegheny County.

## LONG & McKINNEY, for use of C. S. FETTERMAN v. WOOD ET AL.

Where a lease contains a covenant that if the rent is not paid at a specified time it shall work a forfeiture of the lease, and the landlord may forthwith enter and take possession, the non-payment of the rent does not make the lease absolutely null and void, but only voidable at the election of the landlord.

When a landlord with knowledge of the forfeiture, receives rent falling due after that, it is a waiver of the forfeiture ; but not so if the rent was due before the forfeiture.

Under the terms of such a lease, if a landlord proceeds by a landlord's warrant and collects the rent, it is then too late to declare a forfeiture and take possession. If, however, he declared a forfeiture and took possession before, or simultaneously with, the issue of the warrant, the payment of the rent on the warrant would not restore the right of possession to the lessee.

If, through the artifice or trick of the landlord or his agent to enable him to declare a forfeiture, the lessee was induced not to pay the rent within the specified time, it was bad faith—a fraud—on the part of the landlord, and he had no right to take advantage of the delay to declare a forfeiture for the non-payment of rent due.

In an action for breach of covenant for quiet enjoyment the burden of proving a sub-letting on the part of a lessee in violation of his covenant, rests upon the defendant. The lessee's consent to proceedings upon the part of a third party to procure a right of way through the premises, is not a sub-letting.

The word "coal" in this lease construed to have been used in its mercantile sense and not to include nut coal or slack.

The measure of damages for ouster is the marketable value of the lease at the time of the ouster.

Charge to the jury, January 24, 1875, by

WHITE, J. By articles of agreement, dated September 1st, 1869, the defendants "demised and leased" unto Robert Long and J. N. McKinney, partners, doing business as Long & McKinney, certain coal mines, rights and privileges, in Chartiers and Union townships of this county, for the period of five years from September 1, 1869. Long & McKinney, as partners, worked the mines until about September, 1871, when Long sold his interest to McKinney and retired. McKinney then

carried on the works in his own name until July 8th, 1872, when he was dispossessed by the defendants. A few months after that McKinney was put in bankruptcy, and C. S. Fetterman, Esq., appointed his assignee. The assignee brings this action for the breach of the implied covenant of quiet enjoyment, to recover damages from the defendants for their alleged violation of that covenant, by wrongfully evicting McKinney.

The material parts of the lease, so far as this action is concerned, are the following:

1.  The lessors are James T. Wood, Charles A. Wood and Benjamin B. Reath, as trustees under the last will and testament of James Wood, dec'd, and also in their own right and as attorneys in fact of Hannah Wood, widow of James Wood, deceased. The lessees are Robert Long and J. N. McKinney, partners, doing business as Long & McKinney.

2.  The demised premises were "the coal mines of the late James Wood, deceased, situate in Chartiers and Union townships, Allegheny Co., Pa., with the right to mine and remove the coal in and under" certain tracts of land therein described, with certain specified surface and mining privileges. Also the personal property of the lessors then used in and about said coal mines, viz.: fourteen coal cars, one large and small pump, boilers, fire front and pipes attached to the same, "together with all other personal property of the said parties of the first part, being in or about or used in connection with said mines, which said personal property is to be kept in good working order and repair" by the lessees.

3.  The lessees to pay a royalty or rent of 75 cents for each 100 bushels of coal taken out by them, to be paid semi-monthly on the 1st and 15th of each month, during the term of five years, from September 1, 1869, to September 1, 1874.

4.  "The quantity of coal so taken out shall be determined by the books of the Little Saw Mill Run Railroad Company, or by the books of the diggers employed in the said mines, at the option of the lessors." The lessees were to furnish to the lessors for their inspection, the books of the diggers, on the 1st and 15th of each month, if they should be required so to do, and, if requested, they were to furnish a written statement, under oath, of the amount of coal taken out between any two periods of time. They were bound to take out at least 2,500 bushels per day during the continuance of the lease, or pay the semi-monthly rent on that amount.

5.  The lessees were to work the mines skillfully, and "at all times obey the directions of the" lessors or their agent, "in regard to the driving of entries, opening rooms, &c."—the lessors having the right to enter at all times for inspection and to "direct where entries shall be driven and from what part of the land the coal shall be first mined and removed."

6. In case the lessees "should neglect or refuse to pay any instalment of rent on the day it shall fall due and the said rent shall remain due and unpaid for a period of five days, or in case the lessees should continue to violate any of the covenants and conditions in this lease contained, after five days' notice in writing of such violation given to them by the lessors, then the lessors, if they elect so to do, may declare this lease forfeited and void, and proceed forthwith to take possession of the demised premises," Provided, however, that this clause should not affect or impair any other right or remedy of the lessors.

7. "All buildings, erections and fixtures placed upon the surface of the premises" by the lessees, were to remain at the expiration of the lease, and become the property of the lessors.

8. The lessees were not to sub-let the premises, or any part thereof, or assign the lease, without the written consent of the lessors; and if they did, the lessors might, at their option, declare the lease forfeited and void, and forthwith resume possession of the demised premises.

9. At the expiration of the lease the lessees were to surrender peaceable possesssion "of the mines and appurtenances and personal property" therein enumerated "in good working order, condition and repair."

Long & McKinney, and after their dissolution, McKinney continued to pay their rent regularly until the 1st of July, 1872. A large part of the coal they mined was delivered to the rolling mill of James Wood & Co. That firm consisted of James T. Wood and Charles A. Wood (two of the defendants) and James W. Friend. The firm had an office in the city of Pittsburg. The custom was for the Little Saw Mill Railroad Company to give a statement semi-monthly of the amount of coal transported over their road, which McKinney took to the office of James Wood & Co., with a statement made out by himself or his clerk, of the amount of coal mined on which the royalty or rent was to be paid, and gave these statements to the clerk of James Wood & Co. The clerk deducted the freight due to the railroad company and also the tonnage tax, which the firm settled with the railroad company, and prepared two checks of the firm; one for the rent due the estate, and one for the balance due McKinney for the coal delivered to the firm. He sometimes gave both checks to McKinney; and sometimes retained the check for the rent, and handed it over to Mr. Neely, who was the clerk of the estate and had his office in an adjoining room. When McKinney got the check, he handed it over to Neeley. This statement made by McKinney was also handed over to Neeley. This had been the custom ever since McKinney had been carrying on the works by himself, and for some time previous under Long & McKinney. When McKinney called to settle as usual, on the 3d of July, 1872, for the last two weeks of June,

the clerk of James Wood & Co. refused to settle the rent, saying that he had been instructed not to settle it, or give a check as he had been in the habit of doing, but, after deducting the freight and deducting the balance due on an old debt of Long's, which McKinney had assumed, gave him one check for the entire balance due McKinney. McKinney wanted him to deduct the rent, but he refused to do so because of his instructions. No further explanation of the matter was given by the clerk, except that he could settle the rent himself.

On the 8th day of the month (July, 1872), the defendants issued a landlord's warrant for rent due July 1st, $199.41, and the constable levied upon the cars, mules, &c., at the mines. On the evening of that day the amount was paid to the constable and by him handed over to defendants, and received and receipted for by them, or by James W. Friend for them. On the same day or the next, July 9th, by directions of James T. Wood and James W. Friend, two police officers took possession of the mines and prevented McKinney and his men from entering or working them. It was alleged that McKinney had forfeited his lease, and possession was taken in behalf of the lessors. The police officers remained there some six weeks, under instructions from Wood and Friend not to let McKinney or his men enter. McKinney, through F. C. Negley, tried to get possession again but failed. In December following the defendants sold the demised premises to Gray & Bell, made a deed therefor, and gave them possession.

The ouster of McKinney by the defendants is established by the testimony, and not really controverted. But defendants justify on the ground that McKinney had forfeited his lease, and they had a right to enter and take possession. They allege three grounds of forfeiture:

1. The non-payment of the semi-monthly rent due July 1st, 1872, for a period of more than five days; being due on the 1st, and remaining unpaid till the 8th, when they issued their landlord's warrant.

2. That McKinney had sub-let a part of the premises to F. C. Negley, in violation of his contract.

3. That he had neglected or refused to pay rent on the nut coal and slack taken from the mines.

Where the lease, as in this case, contains a covenant that, if the rent be not paid at a specified time, it shall be a forfeiture of the lease and the landlord may forthwith enter and take possession, the non-payment of the rent does not make the lease absolutely null and void, but not voidable at the election of the landlord. He may insist upon the forfeiture and put the tenant out ; or he may waive the forfeiture, hold the tenant to his lease for the whole term and make him pay the rent. Where a landlord, with knowledge of the forfeiture, receives rent falling due after that, it is considered in law a waiver of the forfeiture; but not so if the

rent was due before the forfeiture. These forfeitures are in the nature of a penalty, and frequently work great hardships. The courts, therefore, construe them strictly against the party exacting the forfeiture. But nevertheless, when they are so "nominated in the bond," and the claimant acts in good faith, and the delinquent has been guilty of a plain violation of his covenant, the courts will enforce them. Under the covenants of this lease the defendants had a right, if a semi-monthly installment of rent remained due and unpaid for a space of five days, to declare the lease forfeited, and to enter and take possession of the premises; and also to issue their landlord's warrant for the collection of the rent then due and unpaid: for the proviso to the covenant gives them this right. But the defendants were bound to act fairly and in good faith towards their tenant. When the forfeiture had taken place they had an election to insist upon it or waive it. If they did not choose to declare a forfeiture, but proceeded to collect the rent by a landlord's warrant, after thus collecting their rent, they could not then declare the forfeiture and proceed to take possession. The landlords warrant in this case was issued on the 8th of July, 1872, for $199.41, due on the 1st day of that month. It was paid to a constable and receipted for on the same day. There is some conflict of testimony as to the day when the defendants took possession, whether on the 8th or 9th of the month. If they declared the forfeiture and took possession before, or simultaneously with, the issue of the warrant, the payment of the rent on the warrant would not, under the covenant of this lease, restore the right of possession to McKinney. But if the forfeiture was an after-thought, after collecting the rent, and after receiving full satisfaction, it was too late for the defendants to say they would elect to treat the non-payment of the rent as a forfeiture. The issuing of the warrant and collecting the money without declaring the forfeiture was an election to treat McKinney still as their tenant.

But on this point another question arises. It is contended by the plaintiff's counsel, that McKinney was ready and willing to pay the rent due July 1, at the settlement with James Wood & Co., on the 3d, as had been the custom during his whole tenancy; and that he was induced not to pay it through the artifice and trick of the defendants, or their agent. You will remember the testimony bearing on this question; the manner in which the rent had always been settled; the fact that two of these defendants were members of that firm; that McKinney was required to pay the whole balance of the old claim against Long; that the firm of James Wood & Co. were still receiving coal and were indebted for that; what McKinney, Beltzhoover and Friend say on the subject; the fact that the warrant was issued only five days after that; and all the other circumstances in the case. If you believe from the evidence that it was a

plan of the defendants or their agent to entrap McKinney, to throw him off his guard, to induce him to defer payment so that five days would elapse to enable them to declare a forfeiture, then it was bad faith on the part of defendants—a fraud upon McKinney—and they had no right to take advantage of that delay, and no right on the 8th or 9th of July to declare a forfeiture for the non-payment of the rent due July 1st.

The second ground of defence is, that McKinney had sub-let a part of the premises to F. C. Negley in violation of his covenant, in which there is also a clause of forfeiture, with the right of defendants "to forthwith resume possession." To constitute a breach of this covenant there must have been an actual sub-letting—sub-leasing—of a part of the demised premises. Any binding agreement giving Negley an absolute right to use a part of the demised premises, in derogation of the rights of the lessors, would be a sub-letting. The defendants allege there was a sub-letting and set it up as a justification for their ouster of McKinney. The burden of proving it is upon them. It is not sufficient to raise a suspicion that there was some improper agreement with Negley. The defendants must prove it to your satisfaction. It is not disputed that Negley sought to get a right of way through these mines. There was nothing wrong in that. He applied to the Woodses on the subject and had commenced proceedings in court to obtain the right of way under the lateral railroad law. There was nothing wrong in that,—nothing that should prejudice McKinney's rights. Even if McKinney had given his consent to such proceedings, that would not be a sub-letting or a violation of his covenant. A good deal has been said on this subject, and the defendants' counsel have called your attention to all the testimony bearing upon it.

Does the evidence satisfy you there was an actual sub-letting? It is not for the plaintiff to prove there was not; it is for the defendants to prove there was; to prove the terms and extent of the alleged sub-letting, or agreement, at least so far as to satisfy you that it was a violation of McKinney's covenant. Have they done so? I leave that question for you to determine. If they have the plaintiff cannot recover.

The third ground of defence is, that McKinney had neglected or refused to pay the rent on nut coal and slack. The terms of the lease are, that the lessees shall pay a royalty or rent of 75 cents "for each and every 100 bushels of coal taken out by them," from the demised premises. It seems from the testimony that the coal taken out from the mines is divided into three classes: coal proper, otherwise called lump coal, nut coal and slack. The first is the common mercantile article, that passes over the screens at the mines; nut coal is the small lumps sifted from the screenings, and slack, the dust remaining. The diggers are

paid according to the quantity of lump coal, what passes over the screens, no account being taken of the nut, or slack. Formerly the screenings were considered worthless and thrown away. Lately, however, the nut coal has been separated from the dust, and has become quite an article of trade. There is also some demand and sale for the slack. The nut coal is about one-fifth as much as the lump coal, and the slack about one-half as much as the nut coal. The average prices of sales made by McKinney, delivered at the river, were, for lump coal about $7\frac{1}{4}$ cents per bushel, for nut coal about 3 1-5, and for slack about $1\frac{1}{2}$ cents per bushel. From the commencement of this lease, Long & McKinney, and McKinney after Long went out, returned only the lump coal and paid rent on that alone. No question ever arose on the subject between the parties during the continuance of the lease. The defendants allege they never knew until within two or three months past that McKinney was not paying on the nut and slack, but supposed he was. They now claim that his neglect to pay the royalty on nut coal and slack was a forfeiture of his lease, and they have a right now to set it up as a bar to the plaintiff's recovery in this action, or at least to have the rent on the same set-off against the claim for damages. This raises a question as to the construction of the lease, or what is the true meaning of the word "coal" in the lease. Generally the construction of written agreements is with the court· When words are uncertain or have different meanings, or are used in a technical sense, evidence may be received to explain them, and it may sometimes be a question of fact to be decided by a jury, as to what the word is, or in what sense it was used. Whenever the evidence is conflicting it must be referred to the jury. In this case there is no conflict of testimony, and both parties, plaintiff and defendants, have presented points requiring the court to give a construction of the lease in this particular.

In its general sense undoubtedly the word "coal" embraces all kinds of coal, of every variety and quality, from the most valuable· down to the most worthless. In its mercantile sense, the sense in which it is used in the trade and business, the word, when not qualified by an adjective, means the article commonly used as fuel. In which sense is the word used in this lease? As we have no other evidence on the subject, we must decide this question from a careful reading of the whole lease, in the light of surrounding circumstances, and by the interpretation of the word given by the acts of the parties.

The rent reserved·is 75 cents "for each and every one hundred bushels," one price only, and by fair implication applying to one kind only. The quantity of coal on which the rent was to be paid, was to be determined, at the option of the lessors, from the books of the diggers,

or from the books of the railroad that took the coal to market. This option is not a choice between two different things, but a choice as to the method of ascertaining the same thing or fact; the two sets of books are supposed to give the same information. The choice is supposed to be a matter of indifference to the other party. As the diggers' books were under the entire control of the lessees, the lessors reserved the right to take the books of the railroad company, as a check upon the lessees, and a security that they would make correct returns from the diggers' book. Now it is a fact in evidence and a fact well known that the diggers are paid according to the coal that passes over the screen, and their books contain only the number of bushels of that kind, that is, of lump coal, the common merchantable article. They get no pay for the slack or nut coal, and their books contain no account of such. It is in evidence also that the nut coal is sifted from the screenings, and is not half as valuable as the lump coal; and then the slack scarcely pays for transportation, and is often thrown away in large quantities as utterly worthless. It is unreasonable to suppose that the parties intended a royalty or rent should be paid upon this, equal to the rent upon the best quality. Several of the witnesses spoke of the nut and slack as the refuse of the mines; in their calculations of the value of the lease, they counted only the sales of lump coal, regarding what was realized from nut and slack as incidental savings, which might be considered in estimating the expenses. In the testimony of all the witnesses, perhaps without exception, where they used the word "coal" without any qualification, they referred to the mercantile article, or lump coal. It was invariably so when speaking of the price of coal, of the price paid for digging, of the number of bushels mined, and of the number of bushels in an acre It would seem from the mortgage given by Gray, that this was the sense in which the defendants used the word when they subsequently sold this coal to him. The acts of the parties under this lease confirm this view of the case. When the lease was made, September 1st, 1869, there was a screen at the mines, the same that was used by James Wood in his lifetime, and it was used by McKinney all the time he had possession. The defendants knew this fact, and it is fair to presume they knew the custom in reference to diggers' prices and books. They knew also that McKinney was selling nut coal, for the firm of James Wood & Co., was regularly getting both lump and nut coal from him, paying 6.95 for lump and 3.20 for nut. The firm also every two weeks was getting a statement from McKinney of the number of bushels mined, and from the railroad company the number of bushels transported. The statement of the railroad company contained two items of transportation, one of which as the clerk testifies, was the number of bushels of lump coal and the other of nut and slack. A comparison of these statements would have shown

that McKinney did not return as much as was transported, but that his returns correspond with the bushels of lump coal. They had a right to call for the diggers' books, or to call for a statement under oath, or to take the books of the railroad company, yet they took the statement of McKinney without objection and settled according to it semi-monthly. It is true the defendants, or some of them, testify that they did not know there was any difference in the statements and supposed that McKinney was paying on all. But it was their duty and the duty of their agents, to look into the matter, and when they had the two statements in their hands it is singular that they did not examine them. But whatever their actual knowledge may have been, their acts are a practical sanction of McKinney's course. They were entirely satisfied with it. There can be no doubt that McKinney acted according to his understanding of the lease in returning only the lump coal. And there is no allegation, or at least no evidence, that he did not make correct returns according to the diggers' books.

I am, therefore, of the opinion that the word "coal" in this lease is used in its mercantile sense, and does not include nut coal or slack. I so instruct you, and say that the non-payment of the rent on nut coal and slack was not a forfeiture of this lease, nor can defendants claim any set-off for the same against the plaintiff's damages, if you should find for the plaintiff.

Two questions of the fact are submitted to you ; 1st. Was the neglect of McKinney to pay the rent due July 1st, 1872, induced by the plan, trick or device of the defendants, or either of them, or any agent of them? and

2d. Was there any sub-letting of a part of the demised premises by McKinney to F. C. Negley.

If you find that there was no such plan, trick or device, or that there was such a subletting, then the plaintiff cannot recover. But if you find there was such a plan, trick or device, and that there was no subletting to Negley, in the sense in which I have explained that word, then the plaintiff is entitled to your verdict, and the remaining question is the amount of his damages. The measure of damages, that is, the rule by which you are to estimate them, is the value of the lease at the time of the ouster, July 8th, 1872. You are to transport yourselves back to that period of time, and standing there, with no certain knowledge of the future, inquire what was the value, the marketable value, of the lease then held by McKinney. It was a lease of certain coal mines, rights and privileges, having to run until September 1st, 1874. You must take the lease with all its provisions and covenants, except that you are to presume that McKinney had the consent of the defendants to sell it. You

are to consider only the property embraced in the lease, and not to allow damages for any other personal property owned by McKinney, nor to allow damages by way of punishing the defendants for any outrage or wrongful act committed by them.  McKinney was entitled to compensation for the loss of the demised premises and to an amount equal to their actual marketable value but no more.  I used the word 'marketable,' in the absence of a better word to express the thought.  It means the value or price at which the lease might have been sold if it had been put in the market and offered for sale.  The measure of damages is not the amount of money expended by McKinney in improving the mines, nor the amount of profits he might have made if he had continued to operate the mines for the whole term, but these may be considered in estimating the actual value of the lease.  The value of the lease would depend upon the probable profits that might be realized from the mines during the remaining period of the term, from July 8th, 1872, to September 1st, 1874. McKinney or his purchaser would have to comply with all the covenants of the lease, pay all expenses and rents, keep up repairs, and leave the premises, fixtures, &c., in good condition at the expiration of the lease. These profits are not limited to the amount of coal McKinney was then taking out daily or had taken out nor should they be based on the theory that all the coal would be taken out before September 1st, 1874.  You are to look at the probabilities of the case, and consider these matters only so far as you believe they would influence purchasers, thus throwing light upon the question of value at the time of the ouster.  You will take into consideration also the condition and location of the mines, the competition in the business, the means of transportation, the market and probabilities of the future.  The price at which McKinney bought out Long's interest, the price at which he agreed to sell to A. G. Negley, the offers he made F. C. Negley and to R. Gray, are all strong evidence of McKinney's estimate of the value.  But in these sales and offers you must bear in mind that a good deal of personal property was included not embraced in the lease.  So with the offer of, $32,000 made by F. C. Negley.  The estimates of the value made by F. C. Negley and A. G. Negley seemed to have been based on the supposition that the mines could be drained by a projected tunnel through the lands of other parties so that all the coal could be taken out during the remainder of the lease.  If so, their estimates are entitled to very little if any consideration.  The estimates and opinions of the other witnesses are only to aid you in determining for yourselves the value at the time of the ouster.  And of course the testimony of those witnesses who had the most experience in the business, who knew the most of these mines, had the most knowledge on the subject and the best opportunities of forming a correct judgment, is entitled to the greatest consideration.  Taking all these matters into con-

sideration you will make up your minds as to what was the value of their lease on the 8th day of July, 1872, and if you find for the plaintiff on the other questions submitted to you, your verdict should be for the plaintiff, for the sum thus ascertained, with interest thereon from July 8th, 1872, to the present.